Filed 2/25/15; pub. order 3/26/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re AARON S., a Person Coming Under the Juvenile Court Law. | H040684 (Santa Clara County Super. Ct. No. JD20626) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>AARON S.,<br><br>        Defendant and Appellant. | |

Aaron S. was adjudged a dependent minor when he was 16 years old and became a nonminor dependent when he turned 18.  (Welf. & Inst. Code, § 11400, subd. (v).)[1]  The juvenile court terminated dependency jurisdiction shortly before Aaron turned 19, finding that by not enrolling in school or having a job, Aaron failed to participate in his Transitional Independent Living Case Plan.  (§§ 391, subd. (c)(1)(B), 11403, subd. (b).)  Aaron appeals the order terminating dependency jurisdiction, claiming the juvenile court erred in finding that he was not participating in his Transitional Independent Living Case Plan and that the order must be reversed because the Santa Clara County Department of

---

[1] Unspecified statutory references are to the Welfare and Institutions Code. Unspecified subdivision references are to section 11403.

Family and Children's Services (Department) did not provide him a 90-day transition plan. (§ 391, subds. (c)(1)(B), (e)(2)(J).) For the reasons stated here, we will affirm.

## I.  JUVENILE COURT PROCEEDINGS

Aaron was born in 1994. In 2011 the Department took Aaron into protective custody and filed a petition under section 300, subdivisions (b) (failure to protect) and (g) (no provision for support), alleging that Aaron's mother had abandoned him and his father was incarcerated. The next month, Aaron was declared a dependent minor and placed in a foster home. Parents received reunification services for one year but those services were terminated at the 12-month review hearing due to parents' failure to meaningfully participate. The juvenile court ordered that Aaron receive permanent placement services with a plan of an independent living arrangement and also wraparound "intensive home-based family services" arranged by the Department.

When his parents' reunification services were terminated in May 2012, Aaron was living in a group home and enrolled in an Independent Living Program through the Department. As part of that program Aaron completed a transitional independent living plan and agreement listing goals to transition to independent living, including graduating from high school, obtaining a driver's license, and getting a job. Though his social worker described Aaron as likeable and charming, she indicated that he had poor impulse control and disregarded rules and consequences. Aaron was diagnosed with attention deficit and hyperactivity disorder as well as anxiety disorder and was prescribed medicine that helped improve his impulse control. Aaron admitted using marijuana almost daily.

The social worker prepared a status review report for the six-month review hearing of Aaron's independent living arrangement in November 2012. (§ 366.3, subd. (d).) Aaron reported feeling abandoned by his parents and the social worker opined that Aaron was deeply impacted by his lack of close relationships with any family members or other strong role models. Aaron was attending wraparound family specialist services to discuss his needs, concerns, and goals but the service provider threatened to drop him from the

2

program due to lack of participation. He also attended individual therapy sessions between November 2011 and June 2012 but chose to stop attending them. Aaron was discharged from a transitional housing placement for using marijuana and violating other house rules. He was placed in a group home but the new placement was also precarious because he repeatedly left without permission and continued to use marijuana.

Because Aaron's 18th birthday was approaching, the social worker discussed the benefits and obligations of extended foster care as a nonminor dependent with him. Aaron expressed interest in participating in the program. He told the social worker he wanted to use the system in every way possible, which the social worker interpreted as meaning that he would do "as little as possible and hav[e] 'the system' do as much as possible." At the November 2012 six-month review hearing the court continued dependency jurisdiction and set a hearing for January 2013 regarding Aaron's transition to nonminor dependent status.

Aaron turned 18 in December 2012 and had his first hearing as a nonminor dependent the next month. The Department's report for that hearing noted that Aaron had to be placed in another group home after being discharged from the previous home for curfew violations, drug use, and refusing to attend scheduled appointments. Beginning in November 2012 Aaron attended family specialist appointments more consistently in response to the service provider's threat to discharge him from the program if he continued to miss appointments. Aaron told the social worker he wanted to get a medical marijuana card, which concerned her because he admitted that he sold marijuana and she believed he was self-medicating with marijuana. He attended a continuation high school in Santa Clara and was on track to graduate in 2013 despite a December 2012 disciplinary furlough for truancy and not completing assignments. Aaron said he wanted to get a job but had not turned in applications or accepted support from by the Department. Finally, his involvement with Independent Living Program

services had increased and he was able to cook his own meals, do his own laundry, and use public transportation. The court continued dependency jurisdiction.

After uneventful status review hearings in March and April 2013, the juvenile court held a hearing in May 2013 where the social worker reported that Aaron's school attendance was slipping. Aaron acknowledged that he was not living up to expectations of the nonminor dependent program and stated that he always gets "caught up in friends." His social worker reported that Aaron was not engaging with his Independent Living Program services. The court encouraged Aaron to increase his efforts to comply with his obligations but told the Department to seriously consider whether to recommend terminating dependency at the next review hearing if Aaron's efforts did not improve.

Aaron successfully graduated high school in May 2013 and the court decided not to terminate services at its July 2013 hearing. The court once again reminded Aaron to keep engaging in services. The Department's review report for a September 2013 hearing listed several concerns about Aaron's participation. The social worker found a different psychiatrist for Aaron to attend but Aaron failed to attend all the required meetings with a case manager. Aaron expressed interest in attending community college but, despite reminders from Department staff, he had not completed scholarship and financial aid materials. Aaron wanted to get a job but had not actively searched for jobs or sought help from the Department or its affiliates. Aaron told the social worker he had been offered a construction job by a friend but declined the offer because he would have had to wear long pants and work boots at the job. The social worker listed the services provided by the Department, including face-to-face meetings between Aaron and the social worker, the social worker's communication with Aaron's various service providers, and referrals by the social worker to enroll Aaron in numerous services. The social worker opined that his attitude, behavior, and poor follow-through continued to reflect his earlier statements about using "the system." When reminded that taxpayer money funded the services Aaron received as a nonminor dependent and that those

4

taxpayers did not want to support individuals who refused to meet participation criteria, Aaron reportedly told the social worker " 'what's the big deal, you're paying the taxes anyway.' " The Department recommended continuing dependency for 30 days to provide Aaron another chance to comply with his nonminor dependent obligations. By the time of the September 2013 hearing, Aaron had found work in door-to-door sales and the court continued his dependency.

Aaron stopped working at the sales job, leading the court to schedule a November 2013 review hearing. The court stressed that this was Aaron's last opportunity to demonstrate that he could meet one of the eligibility requirements of the nonminor dependent program. The court made clear this was "do or die time" but that "if you really show me that you're earning it, that you're working or in school," the court would not terminate Aaron's dependency. When asked by the court why dependency should not terminate, Aaron responded: "I don't know where I'm going to live. You guys are helping me." The court set a hearing for December 2013, ordered the Department to prepare a report under section 391 evaluating whether to terminate Aaron's dependency, and ordered Aaron to bring a work search log as well as his attendance sheet for services at the Department's foster youth resource facility (the Hub).

The Department's section 391 report for the December 2013 hearing recommended that the court terminate jurisdiction. Aaron met with a foster youth liaison at Evergreen College and took placement tests in summer 2013. The liaison told Aaron he had to meet with an academic counselor to enroll in classes. The report does not state whether Aaron ever met with the counselor but when the semester started Aaron was not enrolled in any classes. When Aaron returned to the foster youth liaison for enrollment help, she informed him that two classes were still available: College Success and Career Planning. Aaron did not enroll in either class. Aaron still did not have a job and had refused numerous offers of job search assistance by Department and group home staff members.

5

In November 2013, Aaron was asked to leave his group home for numerous rule violations and being disrespectful to staff. He moved into a Transitional Housing Program Plus - Foster Care residence later that month. Aaron had not communicated with his Independent Living Program case manager since August 2013. He did not attend a meeting to draft a 90-day transition plan to assist him in the event that the dependency was terminated. Four people (the social worker, an Independent Living Program case manager, a Joint Decision Making Unit facilitator, and a Transitional Housing Program case manager) were present at the scheduled time for the meeting but left after waiting 45 minutes for Aaron to arrive and unsuccessfully trying to reach Aaron by phone call and text message. Though the section 391 report states Aaron would benefit greatly from the services provided by the nonminor dependent program, his failure to meet any of the eligibility criteria despite extensive support led the Department to conclude that remaining in foster care was not in Aaron's best interests. Among the documents attached to the report was an emancipation letter mailed to Aaron by the social worker detailing Aaron's dependency case history, providing information regarding employment and housing resources, and informing Aaron he could petition to become a nonminor dependent again until he turned 21.

At the section 391 hearing, Aaron's counsel argued that although Aaron did not have a job and was not enrolled in school, he was eligible for nonminor dependent status because he was participating in a program or activity designed to promote or remove barriers to employment. (See § 11403, subd. (b)(3).) Aaron purportedly met this condition based on an on-premises recruiter for a company that provides seasonal warehouse work telling Aaron that he would put him on a list of potential employees if Aaron passed a drug test. The social worker spoke with the recruiter and confirmed that Aaron's representation was accurate, but the recruiter also said that he did not have any current work for Aaron. Aaron was "pretty sure" he would pass the drug test because he had stopped smoking marijuana two weeks before the hearing. Aaron also told the court

he had filled out 27 applications since the last hearing but that he had forgotten to bring the work search log to the hearing.

The court expressed disappointment at Aaron's lack of progress since the last hearing, noting that he still was not enrolled in college, still did not have a job, and that even the potential job at the warehouse was uncertain because it was not clear Aaron could pass the required drug test. The court noted that it did not believe Aaron had learned *any* skills in the past year as a nonminor dependent that would help him to become a successful adult despite the best efforts of the Department. Finding that further "coddling" as a nonminor dependent was not in Aaron's best interests, the court admitted the section 391 report into evidence, dismissed the dependency, and retained jurisdiction to hear future petitions to renew the nonminor dependency. (§ 388, subd. (e)(1).) Neither Aaron nor his appointed counsel objected to the lack of a 90-day transition plan at the hearing.

## II.  DISCUSSION

### A.  NONMINOR DEPENDENCY (§ 11400 ET SEQ.)

At the discretion of the juvenile court, a dependent minor who has a permanent plan of long-term foster care may continue to receive services as a nonminor dependent (as defined by section 11400, subdivision (v)) when he or she turns 18 if the nonminor dependent has a transitional independent living case plan.[2] (§§ 303, subd. (b), 366.32,

---

[2] " 'Transitional independent living case plan' means, on or after January 1, 2012, a child's case plan submitted for the last review hearing held before he or she reaches 18 years of age or the nonminor dependent's case plan, updated every six months, that describes the goals and objectives of how the nonminor will make progress in the transition to living independently and assume incremental responsibility for adult decisionmaking, the collaborative efforts between the nonminor and the social worker, probation officer, or Indian tribal placing entity and the supportive services as described in the transitional independent living plan (TILP) to ensure active and meaningful participation in one or more of the eligibility criteria described in paragraphs (1) to (5), inclusive, of subdivision (b) of Section 11403, the nonminor's appropriate supervised placement setting, and the nonminor's permanent plan for transition to living

subd. (a).)  Nonminor dependents can continue to receive assistance until age 21[3] as long as they meet at least one of the following conditions:  "(1) The nonminor is completing secondary education or a program leading to an equivalent credential.  [¶] (2) The nonminor is enrolled in an institution which provides postsecondary or vocational education.  [¶] (3) The nonminor is participating in a program or activity designed to promote, or remove barriers to employment.  [¶] (4) The nonminor is employed for at least 80 hours per month.  [¶] (5) The nonminor is incapable of doing any of the activities described in subparagraphs (1) to (4), inclusive, due to a medical condition, and that incapability is supported by regularly updated information in the case plan of the nonminor."  (§ 11403, subd. (b)(1)-(b)(5).)  A county's child welfare department must work with a nonminor dependent to ensure that he or she meets one of the five conditions, and the conditions the nonminor dependent meets must be documented in the transitional independent living case plan, which must be updated every six months.  (§ 11403, subd. (c).)

Until 2010, a juvenile court could continue jurisdiction over a nonminor only if it found that a county welfare department had not provided adequate services and that "termination of jurisdiction would be harmful to the best interests of the child."  (Former § 391, subd. (c), Stats. 2000, ch. 911, § 3, pp. 6739-6740; see *In re Holly H.* (2002) 104 Cal.App.4th 1324, 1331 (*Holly H.*).)  With the enactment of the California Fostering Connections to Success Act (Assem. Bill No. 12 (2009-2010 Reg. Sess.); Assem. Bill No. 212 (2011-2012 Reg. Sess.)), the Legislature made major amendments to California's juvenile dependency system as it applied to nonminor dependents.  (See *In re*

_____

independently, which includes maintaining or obtaining permanent connections to caring and committed adults, as set forth in paragraph (16) of subdivision (f) of Section 16501.1."  (§ 11400, subd. (y).)

[3] The maximum age is calculated as follows:  "not more than 19 years of age on or after January 1, 2012, not more than 20 years of age on or after January 1, 2013, or not more than 21 years of age on or after January 1, 2014 ... ."  (§ 11400, subd. (v)(1).)

*Shannon M.* (2013) 221 Cal.App.4th 282, 284 [noting the bills allowed "California to take advantage of newly available federal funding for extended foster care benefits for certain nonminor dependents"].)  As part of those changes, section 391, subdivision (c) was amended to express a preference for retaining jurisdiction over nonminor dependents.  (Stats. 2010, ch. 559, § 28, p. 2720.)  Since January 2012, section 391 requires the juvenile court to continue dependency jurisdiction over nonminor dependents unless either (1) the nonminor does not wish to remain subject to dependency jurisdiction or (2) the nonminor is "not participating in a reasonable and appropriate transitional independent living case plan."  (§ 391, subd. (c)(1)(A), (c)(1)(B).)  Not meeting at least one of the five eligibility conditions in section 11403, subdivision (b) constitutes a failure to participate in a transitional independent living case plan.  (See *In re Nadia G.* (2013) 216 Cal.App.4th 1110, 1119-1120 (*Nadia G.*) [finding nonminor dependent was not participating in her a transitional independent living case plan where she had no job and had not enrolled in school until one week before the termination hearing].)

Before dependency jurisdiction may be terminated, the county welfare department must prepare a section 391 report describing "whether it is in the nonminor's best interests to remain under the court's dependency jurisdiction" and detailing the reasonable efforts it has taken to assist the nonminor in meeting the section 11403, subdivision (b) eligibility conditions.  (§ 391, subd. (b)(2), (b)(3).)  The court must hold a hearing where the nonminor dependent is present (unless the nonminor elects a telephonic appearance).  (§ 391, subd. (b)(1).)  If the court determines that the nonminor is not participating in his or her transitional independent living case plan and that the county welfare department made informational disclosures to the nonminor dependent as listed in section 391, subdivision (e), including a "written 90-day transition plan prepared pursuant to Section 16501.1," (§ 391, subd. (e)(2)(j)), the court may terminate dependency.  Even if the court terminates dependency jurisdiction, it retains "general jurisdiction over the nonminor to allow for the filing of a petition to resume dependency

jurisdiction under subdivision (e) of Section 388 until the nonminor attains 21 years of age ... .”  (§ 391, subd. (d)(2).)

We review the decision to terminate jurisdiction over a nonminor dependent for abuse of discretion.  (*Nadia G., supra,* 216 Cal.App.4th at p. 1119.)

### B.  AARON’S PARTICIPATION IN THE TRANSITIONAL INDEPENDENT LIVING CASE PLAN

Aaron argues that the trial court abused its discretion in finding that he was not participating in his transitional independent living case plan.  Aaron bases his argument on meeting two section 11403, subdivision (b) eligibility conditions: enrollment at a school providing postsecondary education and participation “in a program or activity designed to promote, or remove barriers to employment.”  (§ 11403, subd. (b)(2), (b)(3).)

### 1.  Enrollment in Postsecondary or Vocational Education

Regarding postsecondary education, Aaron asserts his unsuccessful efforts to enroll at Evergreen College should have been deemed compliance with section 11403, subdivision (b)(2).  The record does not support his argument.  Subdivision (b)(2) requires the nonminor dependent to be “enrolled” in a postsecondary or vocational education program.  There is no evidence that Aaron was ever enrolled at the college.  To the contrary, the section 391 report stated Aaron completed a placement test and met with a foster youth liaison who told him to meet with an academic counselor in order to enroll in classes but that Aaron apparently never met with the academic counselor.  When he met again with the liaison during the first week of the semester she discovered he was not enrolled in any classes and told him there were two classes available.  Aaron chose not to enroll in them.  Even excusing Aaron’s initial failure to follow through with an academic counselor, there is no evidence of his actually enrolling despite further contact with the liaison and the opportunity to do so.  The termination hearing occurred in December 2013, several months after Aaron’s unsuccessful August 2013 attempt to enroll in college.  There is no evidence that Aaron made any attempt in the intervening months to

10

enroll in postsecondary or vocational education, including taking steps to enroll in classes for the following spring.

Aaron's arguments regarding enrollment equivalents are unavailing. He urges that the trial court should have treated his unsuccessful attempt to enroll in college as compliance with the condition because that process was particularly daunting for Aaron given his attention deficit hyperactivity and anxiety disorders. He also asserts that although the Department helped him obtain medication that reduced the negative effects of those disorders, he should not be faulted for not taking those medications because the juvenile court could no longer order him to take them once he turned 18. (Citing § 369.5, subd. (f) [exempting nonminor dependents from provision allowing court to make orders regarding administration of psychotropic medications].) Though true that the juvenile court could not force him to take his medications, Aaron was responsible for his decision to forego them and for any negative consequences that followed from that decision.

Aaron's reliance on the All County Letter No. 11-69 (All County Letter) released in 2011 by the California Health and Human Services Agency's Department of Social Services is misplaced.[4] Aaron points to an attachment to that letter stating that a student dropping courses mid-term shall not result in automatic dependency termination. Though Aaron argues his failure to enroll should be deemed the equivalent of a failure to complete a course, we find no abuse of discretion in distinguishing these actions. On this record the juvenile court acted within its discretion in finding Aaron did not meet the plain terms of section 11403, subdivision (b)(2).

### 2. Participation in a Program Designed to Promote Employment

Aaron argues that contacting an employment recruiter and participating in his Independent Living Program satisfied section 11403, subdivision (b)(3) as programs or activities "designed to promote, or remove barriers to employment." Aaron's

---

[4] At Aaron's request, we took judicial notice of the All County Letter.

Transitional Independent Living Plan and Agreement did not include any specific goals related to that condition, instead focusing generally on enrolling in postsecondary education and finding employment. Even if the broad goals of enrolling in college and seeking employment *could* be seen as a program or activity described in subdivision (b)(3), the juvenile court acted within its discretion in finding that Aaron's minimal efforts did not meet the condition.

Attachment A to the All County Letter states that subdivision (b)(3) is "very broad" but "should always be used as a back-up plan" to "bridge gaps in a nonminor dependent's readiness for achieving more responsibility in college, vocational school or employment." By the time of the termination hearing, the juvenile court had given Aaron numerous opportunities to demonstrate that he could meet one of the conditions of section 11403, subdivision (b). By graduating high school Aaron showed a readiness to achieve more responsibility. However, except for his brief employment in door-to-door sales, Aaron did little to remain eligible for dependency services between graduating high school in May 2013 and contacting a recruiter for seasonal work some six months later. The juvenile court was not presented with a situation where an otherwise compliant nonminor needed to rely on a "back-up" condition to bridge a short gap in compliance.

Aaron's initial application to work at a company providing seasonal employees did not meet the subdivision (b)(4) employment condition because he still had to pass a drug test which, as the juvenile court noted, was not assured in light of Aaron's marijuana use. Even if he did pass the drug test, the recruiter had informed the social worker that Aaron would not immediately have a job and would merely be placed on a list of potential employees for future work. On this record, the juvenile court could reasonably conclude that Aaron's contact with the recruiter did not satisfy subdivision (b)(3).

Alternatively, Aaron argues his participation in his Independent Living Program should be deemed compliance with subdivision (b)(3). He claims the social worker's statement in the section 391 report that he did not engage with his Independent Living

Program worker is "unclear" and that "it is clear he was still enrolled" in a plan. However, later in that report the social worker elaborated that Aaron had not reached out to his Independent Living Program case manager since summer 2013 when she took him to see the foster youth liaison at Evergreen College. The case manager had not seen him at the Hub in " 'awhile,' " and Aaron never sought employment assistance from the case manager. Based on those statements, the juvenile court could conclude that Aaron was not *participating* in an Independent Living Program.

### 3. Best Interests

Aaron argues that the trial court's decision to terminate dependency jurisdiction was not in his best interests. All dependency cases involve consideration of the best interests of the dependent. (*Nadia G., supra,* 216 Cal.App.4th at pp. 1118-1119 ["The principal question to be addressed when deciding whether to terminate jurisdiction over a child in long-term foster care is the best interest of the child."].) Though section 391 requires consideration of "whether it is in the nonminor's best interests to remain under the court's dependency jurisdiction," the juvenile court is nonetheless authorized to terminate jurisdiction over a nonminor dependent if he or she is not participating in his or her case plan. (§ 391, subds. (b)(2), (c)(1)(B).) As it is axiomatic that it would be detrimental for *any* nonminor dependent to stop receiving services, the mere assertion of such detriment without any proof of reasonable participation by the nonminor in his or her case plan does not demonstrate that the court abused its discretion.

The cases Aaron relies on for his best interests argument do not interpret the current version of section 391 and are thus distinguishable. *In re Robert L.* (1998) 68 Cal.App.4th 789, 794, predated section 391 and found that under the dependency scheme in place at that time the juvenile court could only retain jurisdiction over a nonminor on a showing of "existing and reasonably foreseeable future harm to the welfare of the child." *Holly H.* applied a previous version of section 391, subdivision (c), which expressly provided that the juvenile court may continue jurisdiction over a nonminor if it found

13

"that termination of jurisdiction would be harmful to the best interests of the child."
(Former § 391, subd. (c), Stats. 2000, ch. 911, § 3, pp. 6739-6740; see *Holly H.*, *supra*,
104 Cal.App.4th at p. 1331.)

Aaron states that the most important service he lost through termination of
dependency jurisdiction was housing support. However, as the social worker noted in the
emancipation letter she sent to Aaron, he remained eligible to receive services (including
housing support) through the county's Independent Living Program until he turned 21.
Aaron was also eligible to participate in the Transitional Housing Program-Plus for at
least 24 months. (§ 11403.2, subd. (a)(2)(A) ["Any former foster youth at least 18 years
of age and ... not more than 24 years of age who has exited from the foster care system on
or after his or her 18th birthday [can] ... participate in Transitional Housing Program-Plus
... if he or she has not received services under this paragraph for more than a total of 24
months"].) He was on a waiting list for housing through Transitional Housing Program-
Plus as of the section 391 report, and that program remained an available service to him
even after termination of jurisdiction.

Because the trial court acted within its discretion in finding that Aaron did not
meet any of the section 11403, subdivision (b) conditions, it was likewise within its
discretion to conclude he was "not participating in a reasonable and appropriate
transitional independent living case plan." (§ 391, subd. (c)(1)(B).)

C. **THE DEPARTMENT'S FAILURE TO PROVIDE A 90-DAY TRANSITION PLAN**

Aaron argues that the juvenile court's order must be reversed because the
Department failed to provide him a 90-day transition plan as required by section 391,
subdivision (e)(2)(j). The Department tacitly acknowledges that no 90-day transition
plan was produced, but it argues that Aaron is responsible for the omission because he
did not attend the scheduled meeting with his social worker at which they were to draft
the plan, and he did not respond to a follow up phone call from the social worker a few
days later.

14

The 90-day transition plan is intended to provide minors and nonminors who are exiting dependency jurisdiction with resources to assist in transitioning to independence. The social worker "shall provide the youth or nonminor with assistance and support in developing the written 90-day transition plan, that is personalized at the direction of the child" before dependency jurisdiction is dismissed.  (§ 16501.1, subd. (f)(16)(B).)  The information in the plan should be "as detailed as the participant elects" and "shall include, but not be limited to, options regarding housing, health insurance, education, local opportunities for mentors and continuing support services, and workforce supports and employment services, a power of attorney for health care, and information regarding the advance health care directive form."  (*Ibid.*)

Aaron arguably forfeited this issue by failing to object before the juvenile court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 [Dependency matters are not exempt from the rule that "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court."].)  Forfeiture is appropriate in this case given that Aaron's own failure to meet with the social worker led to the plan never being created.  (See *Caminetti v. Pacific Mut. Life Ins. Co.* (1943) 22 Cal.2d 386, 392 [forfeiture rule keeps a party from playing " 'fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not.' "].)

Even assuming the issue was not forfeited, termination without proof of a 90-day transition plan was harmless here because the Department separately provided information to Aaron regarding each of the categories that would have been included in the plan.  (*People v. Watson* (1956) 46 Cal.2d 818, 836-837.)  For housing, employment, educational and continuing support services information, the emancipation letter that was mailed to Aaron before the termination hearing referred him to his Independent Living Program case manager and provided contact information for Transitional Housing

Program providers.  That letter also informed Aaron he was eligible for health benefits through Medi-Cal, and the section 391 report indicated the Department mailed Aaron a copy of the advanced health care directive form.

## III.    DISPOSITION

The order is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Bamattre-Manoukian, Acting P.J.

_____

Mihara, J.

Filed 3/26/15

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re AARON S., a Person Coming Under the Juvenile Court Law. | H040684<br>(Santa Clara County<br>Super. Ct. No. JD20626) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>AARON S.,<br><br>　　　　Defendant and Appellant. | |

BY THE COURT:

　　The opinion that was filed on February 25, 2015, is certified for publication.


　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　Grover, J.


　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　Bamattre-Manoukian, Acting, P. J.


　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　Mihara, J.

The written opinion which was filed on February 25, 2015, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is therefore ordered that the opinion be published in the official reports.

Dated: _____          _____

Bamattre-Manoukian, Acting P. J.

2

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.  1-11-JD020626 |
|---|---|
| Trial Judge: | Hon. Shawna M. Schwarz |
| Counsel for Plaintiff/Respondent:<br>Santa Clara County Department of Family<br>& Children's Services | Julie Fulmer McKellar, Deputy County<br>Counsel<br>Teri L. Robinson, Deputy County<br>Counsel<br>Orry P. Korb, County Counsel<br>Office of the County Counsel |
| Counsel for Defendant/Appellant:<br>A.S. | Linda K. Harvie |
| Counsel for Defendant/Appellant:<br>A. S. | Sixth District Appellate Program |

*In re A.S./Santa Clara County Department of Family & Children's Services v A.S.*
**H040684**