Filed 11/12/20  In re B.S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re B.S. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent;<br>v.<br><br>R.L. et al.,<br><br>    Defendants and Appellants. | E074978<br><br>(Super.Ct.Nos. J259894,<br>                      & J261355)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant mother.

1

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant father.

Pamela J. Walls, Special Counsel and Michelle D. Blakemore, County Counsel, for Plaintiff and Respondent.

Mother and father appeal from a judgment pursuant to Welfare and Institutions Code[1], section 366.26, terminating parental rights as to minors B.S. and K.S.[2], following a protracted dependency case that commenced in 2015 over mother's opiate use and failure to supervise the children.[3] Father did not seek services or to change his designation from alleged father to presumed father for more than a year, when San Bernardino County's Children and Family Services (CFS) filed a supplemental petition pursuant to section 387. In the course of those proceedings, father made a request to have his status changed to presumed father at the detention hearing, as well as in a subsequent petition for modification pursuant to section 388. Those requests were denied, and, at the jurisdictional hearing on the 387 petition, services were denied for either parent. Due to difficulty finding an adoptive placement for the children, the selection and

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise specified.

[2] At oral argument, father stated he was only challenging the ruling terminating parental rights as to B.S., Jr., but his notice of appeal and opening brief, as well as mother's notice of appeal, referred to both children.

[3] An older half-sibling, R.S., is not involved in this appeal. References to R.S. are for historical context only.

implementation hearing did not occur until March 2020, at which time the juvenile court terminated parental rights, freeing the children for adoption. Both parents appealed.

On appeal, father argues that (1) the juvenile court erred in not changing his status from that of biological father to presumed father; (2) his due process rights were violated by the trial court, which terminated his parental rights without a finding of his unfitness. Mother joins father's arguments. We affirm.

## BACKGROUND

*a.  Original Dependency Petitions*

On April 16, 2015, R.C., a severely autistic child then aged 8 years old, and B.S., Jr., then age 2, were taken into CFS custody when they were found to have been left alone at home without any supervision. Mother, who was pregnant at the time, returned home approximately 40 minutes later, and reported she had left the children in the care of a downstairs neighbor to go grocery shopping, but the neighbor was unaware of the arrangement and mother returned to the apartment without any groceries. Further, mother's purse was in the apartment while she was gone. Mother was arrested for child endangerment. In attempting to locate relatives with whom to place the children, CFS learned that the father of B.S., Jr., does not visit the child, does not pay child support, and mother had not seen him for months.

On April 21, 2015, a dependency petition was filed due to neglect by the mother and father of B.S., Jr. The petition alleged that mother was arrested on April 16, 2015,

3

for leaving B.S. Jr.[4] unattended, within the meaning of section 300, subdivision (b), and that father was negligent in failing to supervise the child and failing to provide adequate food, clothing, shelter or medical treatment.  The petition also included an allegation under section 300, subdivision (g), that both parents had failed to make provision for support of the child in that father's whereabouts were unknown and mother was incarcerated.  The child was ordered detained, but father did not attend the original detention hearing or the continued hearing.

The jurisdictional report noted that mother denied substance abuse but admitted to having a diagnosis of schizophrenia for which she had previously taken medication.  During the interview, mother appeared to have developmental delays and displayed a flat affect, so the social worker informed mother that the petition would be amended to add an allegation of untreated mental health issues.  On May 13, 2015, the amended petition was filed, adding an allegation that mother has mental issues affecting her ability to properly care for the children and which were left untreated.[5]

On June 4, 2015, the court conducted the jurisdictional hearing as to B.S., Jr., with mother present, but father was not present in court.  Mother submitted on the petition, which was sustained.  B.S., Jr. was declared a dependent and removed from the custody

---

[4] A similar petition respecting R.C. is not included in the record on appeal because his status is not at issue in this appeal.

[5] Note that in the original petition relating to B.S., Jr., father B.S., Sr. was included in allegations under both section 300, subdivisions (b) and (g).  However, the amended petition respecting B.S., Jr., includes allegations against R.C., Sr., the father of R.C.

of the parents. A reunification plan was adopted and mother was ordered to participate. Father B.S., Sr. was deemed an alleged father. There was no appeal from the findings or judgment.

In July 2015, K.S. was born with a positive toxicology screen for opiates. Mother informed the reporting party that the father, B.S., Sr., was incarcerated. A dependency petition pursuant to section 300, subdivision (b), was filed on July 29, 2015, alleging that mother's substance abuse negatively impacted her ability to provide for and parent the child and that father B.S., Sr., has a criminal history that negatively impacted his ability to provide for the child. The petition included an allegation under section 300, subdivision (g), that the alleged father failed to make adequate arrangements for the child, as well as under section 300, subdivision (j), that K.S. was at risk based on mother's neglect of her sibling. Mother voluntarily signed a release to allow CFS to take the child into temporary custody, so K.S. was taken into custody. Both parents appeared at the detention hearing, at which the court ordered the temporary out-of-home placement of the child.

The jurisdiction report for K.S. indicated father was aware of the dependency action relating to his son, B.S., Jr., and had contacted CFS about the matter. At that time, the social worker had advised him to attend the hearing and request reunification services, but father did not, and he did not maintain contact with CFS. The report also noted that mother had tested positive for opiates when the court had ordered an on-demand test at the detention hearing.

5

On August 20, 2015, the jurisdictional hearing was held, for which father and mother were both present. Both parents waived trial rights and submitted the petition on the basis of the social worker's reports. The court adopted the findings and recommendations set out in the social worker's report (including the recommended finding that father remain an alleged father), declared K.S. a dependent of the court pursuant to section 300, subdivisions (b), (g) and (j); it ordered reunification services for mother, while also directing her to participate in a psychological evaluation. The court dismissed one of the allegations against father, specifically, the allegation that he failed to protect the child from mother's substance abuse. However, it sustained the allegation that his criminal history negatively impacts his ability to provide for and parent the child. Also as to father, the court found he was an alleged father who is not entitled to services, as recommended in the jurisdiction/disposition report. Neither parent appealed.

The six-month review hearing was held on March 21, 2016, at which time mother's services were continued, and CFS was granted authority to liberalize her visitation. Father did not appear at the hearing or request to have his status changed to presumed father. Neither parent appealed this order.

In May 2016, the 12-month review report respecting B.S., Jr., was submitted, also recommending continued services for mother, with a good prognosis for reunification. As to father, that report again referred to him as an alleged father who was not entitled to services. Father did not attend the hearing on May 23, 2016, where the court ordered continued services for mother respecting B.S., Jr., including unsupervised visits. On that

6

same day, CFS submitted a non-appearance review packet respecting K.S., recommending unsupervised visitation due to mother's continued compliance and improved parenting.

>    b.    *Return of the Children to Mother on Family Maintenance*

On September 1, 2016, the court approved an extended visit for mother with B.S., Jr., as well as K.S. And while the recommendation for the upcoming review hearings was to continue reunification services, on September 23, 2016, CFS recommended that the children be returned to the mother. That day, the children were returned to mother under a family maintenance plan. Father was not present in court at this hearing and requested neither reunification services nor a change in his paternal status.

By May 2017, when the status review report pursuant to section 364 was prepared, family maintenance continued, as mother continued to participate in the plan actively. The only concern for CFS related to R.S., the older half-sibling of B.S., Jr., and K.S., whose autism was a substantial disability. In addition to his special needs of an educational nature, his behavior exacerbated problems finding an appropriate program for him.

Curiously, the report refers to father's status as that of alleged father for B.S., Jr., but states that as to K.S., he was determined to be "the presumed father, not entitled to services at the JD hearing on June 4, 2015." This appears to be a typographical error because it is not supported by the record, which shows that K.S. had not yet been born,

much less adjudicated a dependent, on that date. The minute order dated June 4, 2015, relates to B.S., Jr., and found that B.S., Sr., was an alleged father, not entitled to services.

In an addendum report, the social worker described difficulty mother experienced getting services for R.S., because after he was returned to her custody, he was no longer eligible for AB 490 funding to assist foster children with special needs. Additionally, mother had financial difficulties related to the fact it took two months to begin receiving assistance for the children. The social worker was also concerned that mother had not submitted to random testing as required by her service plan.

Nevertheless, mother had maintained a clean home with adequate food and clothing for the children, they were attached to her, and she showed no signs indicative of drug use. On April 21, 2017, the court continued the family maintenance services, and ordered mother to submit to on-demand drug testing, although her last on-demand drug test was negative. Father did not attend this hearing.

*c.        Supplemental Petition and Father's First 388 Petition*

That status quo did not last long. On July 18, 2017, CFS filed a supplemental petition pursuant to section 387, alleging that the prior disposition had not been effective in the protection of the children, after mother was found passed out in her car, with temperatures of almost 100 degrees, with all three children in the vehicle, crying, and without child restraints. The car contained children's clothing and hygiene items suggesting the family had been living in it, and prescription medication not prescribed to mother were also found.

8

At the detention hearing, father was present and was ordered to return at a further hearing because mother, who had been arrested, had not been transported. The children were detained in foster care. At the continued detention hearing, mother was once again not transported, but father did appear. He did not request a change in his status.

Mother was finally transported to court on July 21, 2017, for the detention hearing, where father again appeared. The parents denied the allegations of the section 387 petition, and the court removed the children from mother's custody and placed them in the temporary custody of CFS. The parents were admonished that pursuant to section 361.5, the court might not order reunification services. At this hearing, for the first time, father requested presumed father status as to both children.

When interviewed for the jurisdiction report, mother did not seem to grasp the seriousness of her actions, taking responsibility only for not having car seats for the two younger children. Additional allegations came to light as the social worker learned that father had burned K.S. with a cigarette and had hit her in the eye. Further, mother had placed B.S., Jr., in very hot bath water, although the time frames for these acts were unclear. Regarding paternity, the social worker indicated father was an alleged father as to both B.S., Jr., and K.S., having previously been found so by the court at the children's respective jurisdictional/dispositional hearings, and indicated he was not entitled to services.

Prior to the jurisdictional hearing on the section 387 petition, father filed a Request to Change Court Order (JV-180, § 388), seeking to be declared the presumed father of all

three children, and to receive reunification services. The petition indicated that there were no allegations against him insofar as the prior petitions "only" related to his failure to protect the children from mother's conduct and his in-custody status. Father explained he had lived with mother prior to May 2012, during which time he parented R.S., but he had been in custody from May 10, 2012 through April 2014, and again from June 1, 2015 through May 31, 2016. He also stated he lived with mother sharing parental responsibilities for R.S. and B.S., Jr., after his 2014 release, until his 2015 re-incarceration. And when the children were returned to mother's custody, mother permitted him to visit the children. He explained that but for his custodial status, he would have executed voluntary declarations of paternity for each child.

The court set the matter for hearing and directed CFS to respond to the petition. In its response, CFS recommended that the court deny father's petition, although the social worker did note that the children appeared to be comfortable around him at a visit. The social worker noted father's criminal history over the course of the past ten years, which included a drug related conviction as well as convictions for being a felon in possession of a firearm and actively participating in a criminal street gang, although father had attributed his incarceration to burglary. Because of father's own custodial history, the social worker considered that awarding him custody of the children was out of the question.

On October 16, 2017, the court ordered paternity testing for father, but denied the section 388 petition because the petition failed to state a change of circumstances and did

10

not demonstrate the proposed change would be in the children's interests. Subsequent testing confirmed biological paternity as to both B.S., Jr., and K.S. The social worker provided this additional information to the court on November 3, 2017.

On November 3, 2017, the court sustained the section 387 petition, removing the children from mother, terminated her services, and scheduled a section 366.26 hearing to select and implement permanent plans for the children. Father was not present at the hearing. The court adopted the social worker's recommendation of a permanent plan of another Planned Permanent Living Arrangement (PPLA) (§§ 366.26, subd. (c)(4)(B)(ii); 16501, subd. (i)(2))[6], pending an approved placement of R.S. with an out of state relative under the Interstate Compact for the Placement of Children (ICPC). The court also found that father was the biological father of the two children.

*d.     Permanency Planning*

On May 3, 2018, father appeared at the Post-Permanency Review Hearing (§ 366.3), where the court affirmed the termination of services and found a compelling reason exists for determining that a hearing pursuant to section 366.26 is not in the children's (R.S.) best interests, ordered a PPLA for all children with a goal of adoption, and directed the social worker to include a permanency plan for B.S., Jr., and K.S.

On October 23, 2018, the social worker reported that the permanent plan of PPLA for all three children remained appropriate because the ICPC case was closed due to the noncooperation of the paternal grandmother in Oregon, and the maternal aunt's failure to

---

**6** Such plans are designed for implementation respecting dependent children who are 16 years of age or older, or non-minor dependents, for whom adoption is not a goal.

follow up the with the relative assessment for all three children. B.S., Jr., and K.S. were very close to their caretakers, but the caretakers were in late middle age and in the process of adopting another child.

Regarding family visits, the social worker noted that the children had maintained relationships with their mother, maternal grandmother, and maternal aunt; in addition, the worker noted that father is present at many, but not all, weekly visits. The social worker had provided information about B.S., Jr. and K.S. to adoptions in hopes of finding an adoptive placement, but the current caretakers were comfortable with the children placed in their home. The section 366.3 review hearing was held on November 2, 2018, in father's absence. The court was concerned that B.S., Jr. and K.S. were still in permanent foster care and directed CFS to identify a concurrent planning home and begin a broader search for a permanent placement. The court made a finding that as to R.S., that he was not a proper subject for adoption, but found that for B.S., Jr. and K.S. an adoptive home had not yet been identified.

In May 2019, the social worker reported the children's status was the same for the next post-permanency status review hearing. (§ 366.3.) The two younger children remained in their foster family placement, as the social worker continued efforts at finding a relative placement for them. Because those efforts had not been fruitful, the adoptions supervisor commenced paperwork to match the children with prospective adoptive parents. The section 366.3 review hearing was conducted on May 2, 2019, with

12

father and mother in attendance, and the court adopted the findings and recommendations of CFS.

This situation persisted until November 2019, when CFS made similar recommendations. During this review period, another relative came forward expressing a desire for placement of B.S., Jr. and K.S., but was eliminated from consideration after attending a single visitation and not showing the requisite interest in the children. Apparently, the search for non-relative prospective adoptive parents was impeded by missing information about the children. However, in September 2019, the goddaughter of the current caretakers expressed an interest, and around the same time, the current caretakers felt that they were now in a position to adopt the children.

On November 1, 2019, the post permanency reviewing hearing took place. Father did not appear at the hearing. The court scheduled a section 366.26 hearing, and directed that father be notified of his writ rights. In March 2020, the social worker prepared an adoptability assessment of the children and the prospective adoptive parents, concluding that the children were adoptable and the prospective adoptive parents were an appropriate adoptive placement. The social worker recommended that parental rights be terminated for B.S., Jr. and K.S.

On March 2, 2020, father filed a second Request to Change Court Order (JV-180; § 388), this time *pro se*, omitting to state what order he desired changed or the precise date of the order, but indicating he desired to parent his children. As for the new order he sought, father said he wanted the court to help him the way it had helped the mother,

13

back when he did not have the support he currently has.  As for how the proposed order would be in the children's best interests, father explained he came from a family where his mother and father raised him and he wanted to do the same with his children.  The petition was summarily denied on March 3, 2020, because it failed to state new evidence or changed circumstances, and because the proposed change did not promote the best interest of the child.

The selection and implementation hearing (§ 366.26) occurred on March 13, 2020. Both parents appeared.  Father sought to have the children testify, but the County argued he lacked standing to call witnesses because he was still an alleged father who did not qualify as a *Kelsey S.*[7] father.  Nevertheless, minors' counsel called B.S., Jr. to testify at the hearing.  B.S., Jr. testified he lived with this grandparents and he wished to be adopted by them.  It is unclear if he was in a new placement with his maternal grandmother as indicated by mother's counsel  or if was still placed with his caretakers, to whom he referred variously as "Grandma" and "Grandpa" or "mom" and "paw paw" after adoption had been identified as the permanent plan.  He also enjoyed visits with his parents and would be sad if he were unable to visit with them anymore.

After hearing testimony and argument by counsel, the court terminated parental rights, freeing the children for adoption.  Both parents appealed.

_____

[7]  Referring to *Adoption of Kelsey S.* (1992) 1 Cal.4th 816.

14

1.     *Father Did Not Qualify As a Presumed Father.*

Father argues that at the section 366.26 hearing, the issue of paternity arose again, and the juvenile court erred by finding him to be merely a biological father. He does not challenge the denial of his previous 388 petition requesting such relief, which was denied on October 16, 2017, and such a claim would be barred by failing to timely file a notice of appeal. Nor does he claim the court erred in denying his second modification request, summarily denied on March 3, 2020. Instead, he claims the court erred in considering him to be merely a biological father, a designation that occurred on November 3, 2017. Father did not properly preserve the issue for appeal, where the time to challenge the earlier determination is long past.

At the section 366.26 hearing, when the court referred to father as an alleged father in discussing whether the children could be called to testify at the hearing, father corrected the court by stating that he had previously been found to be the biological father. The court made no findings, *per se* as to father's status at the 366.26 hearing, other than to clarify it was adopting the prior findings and orders regarding paternity issues. The court had referred to father in passing as the alleged father, but father's counsel corrected the court to indicate he had been deemed a biological father. But father made no motion to be deemed a presumed father. By failing to litigate this issue or request a ruling from the juvenile court, father failed to preserve the issue on appeal. (*In re A.K.* (2017) 12 Cal.App.5th 492, 501.)

In this manner, father has forfeited any challenge to his status being "considered" that of a biological father by failing to object or make a specific request before the juvenile court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 [holding that dependency matters are not exempt from the rule that "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"]; *In re Aaron S.* (2015) 235 Cal.App.4th 507, 521.)

To the extent father wishes to revisit the issue by challenging the court's adoption of the prior finding, the rule is clearly established that a "[c]hallenge to the most recent order entered in a dependency matter may not challenge prior orders for which the statutory time for filing an appeal has passed." (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811; see also *In re Elizabeth M.* (1991) 232 Cal. App. 3d 553, 563.) As a consequence, """"an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." [Citation.]' [Citation.]" (*In re S.B.* (2009) 46 Cal.4th 529, 532.)

Here, the father's status was established in November 2017, and cannot be reviewed in this appeal, simply because the court adopted its prior findings and orders.

In any event, even if father had preserved the issue for review, he failed to satisfy the requirements of Family Code section 7611 entitling him to recognition as a presumed father, because he never received the children into his home or fully committed to his parental responsibilities. (*Adoption of Kelsey S., supra*, 1 Cal.4th 816, 849.)

A biological father has the burden in the juvenile court to demonstrate he is entitled to presumed father status based on *Kelsey S., supra*, 1 Cal.4th 816 status. (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679.) In particular, the father must demonstrate a willingness himself to assume full custody of the child—not merely to block adoption by others. (*Kelsey S., supra,* 1 Cal.4th at p. 849.) "A court should also consider father's public acknowledgment of paternity, his payment of pregnancy and birth expenses commensurate with his circumstances, and prompt legal action to seek custody of the child." (*Ibid.*; see also, *In re Jesusa V*. (2004) 32 Cal.4th 588, 610-611, citing *Adoption of Michael H*. (1995) 10 Cal.4th 1043, 1055.)

Father never executed a voluntary declaration of paternity, nor provided support for mother and the children, nor initiated prompt legal action to seek custody, nor ever acted in a parental capacity respecting his children other than to visit them while other caretakers shouldered the day-to-day responsibility of parenthood. He is not a presumed father. We do not need to reach the assertion he signed a voluntary declaration of paternity where there is no evidence in the record that one was ever executed.

2. *As a Biological, Rather than a Presumed Father, the Court Was Not Required to Find Detriment or Unfitness Before Terminating Parental Rights.*

Father argues that his due process rights were violated by terminating his parental rights without a finding of detriment or unfitness being made against him prior to the section 366.26. We disagree.

17

It is correct to say that "[p]rinciples of due process require that a juvenile court not terminate a presumed father's parental rights without first finding, by clear and convincing evidence, that the father is unfit." (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1205.) However, as we discussed in the previous section, father's status at the section 366.26 hearing was that of a biological, not a presumed father. There is no constitutional requirement to find unfitness before terminating parental rights as to an alleged or biological father. (*In re Jason J.* (2009) 175 Cal.App.4th 922, 933-934.) Thus, there is a flaw in father's reasoning: he was not a presumed father entitled to a finding on his unfitness, he was a biological father.

The cases uniformly hold that as to a presumed father, a juvenile court may not terminate parental rights without having made a finding of unfitness or detriment as against the father during the dependency, but that this requirement is inapplicable to fathers' whose statuses are limited to "alleged" fathers or "biological" fathers. (*In re A.J.* (2015) 239 Cal.App.4th 154, 163.) Father's assertions respecting the requisite findings to be made before parental rights can be terminated do not apply to a man who, like father, has never achieved that status.

Additionally, there was, in fact, a detriment finding against father. While the allegation as to father was dismissed from the original petition respecting B.S., Jr., as an alleged father, the court was not required to find detriment before terminating parental rights. (*In re D.R.* (2016) 6 Cal.App.5th 885, 893.) As to K.S., the petition included an allegation that father's criminal history negatively impacted his ability to adequately and

18

appropriately provide for and parent the child, which was sustained, although the court dismissed another allegation that he failed to protect K.S. from mother's substance abuse.[8]

Because the court made a finding of substantial risk of severe physical or emotional harm (§ 361, subd. (c)) and removed custody from both parents in the proceeding relating to K.S., he was not a non-offending parent, and he had been the subject of an unfitness or detriment finding. (*In re D.H.* (2017) 14 Cal.App.5th 719, 722, fn. 1 [a "nonoffending" parent is one who has not been the subject of a jurisdictional finding under section 300, citing *In re A.A.* (2012) 203 Cal.App.4th 597, 606].)

Father's continued status as a biological father rendered inevitable what followed. California law distinguishes between presumed fathers, biological fathers, and biological fathers who come forward early in the dependency case and display full commitment to

---

**8** At oral argument, father urged us to not "muddle" the detriment findings respecting K.S., asserting that there were no separate or specific detriment findings respecting B.S., Jr. Father acknowledged that as a biological father rather than a presumed father, there was no requirement that the juvenile court make a specific finding of detriment as to father. We agree with the statement in part, but father's notice of appeal referred to both minors and his opening brief challenged the termination of parental rights on the ground there was no finding unfitness at any point in the dependency. We were thus required to address the findings of detriment made, which were applicable to father, notwithstanding his status as a biological father. "Detriment, as that term is used in dependency proceedings, is the standard. It is the standard used in dependency proceedings to remove custody from a parent and eventually terminate parental rights." (*In re D.H.* (2017) 14 Cal.App.5th 719, 738, citing *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 256.) To address father's contentions on appeal as to the lack of unfitness findings, it was incumbent upon us to point out the allegations and findings respecting father's conduct which formed the basis for the petitions relating to both children, as well as the detriment findings in their dispositional orders, which ultimately led to the termination of parental rights.

19

the child (*Kelsey S.* fathers).  (*In re A.S.* (2009) 180 Cal.App.4th 351, 362, citing *In re Zacharia D.* (1993) 6 Cal.4th 435, 451; *Adoption of Kelsey S., supra,*1 Cal.4th 816; *In re Jason J.* (2009) 175 Cal.App.4th 922, 931–932.)  "[T]he court does not err by terminating a biological father's parental rights when he has had the opportunity to show presumed father status and has not done so."  (*In re A.S., supra,* 180 Cal.App.4th at p. 362; *In re Ninfa S.* (1998) 62 Cal.App.4th 808, 811; *In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1652–1655.)

Father never availed himself of the opportunity to show his commitment to parenting his children, and acknowledges that mere biological parents do not have the same fundamental liberty interest protected by the due process clause as presumed fathers.  (*In re A.S., supra*, 180 Cal.App.4th at p. 359; *In re Christopher M*. (2003) 113 Cal.App.4th 155, 160.)  Because father's status was not that of a presumed father, the termination of his parental rights did not violate his constitutional rights.

Mother raises no independent issues affecting the validity of the findings or judgment as to the termination of her parental rights.  Therefore, the judgment was correct.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

FIELDS
J.