Filed 12/4/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re H.C., a Person Coming Under the Juvenile Court Law. | |
| | D072368 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ014860) |
| v. | |
| H.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Reversed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

H.C., a nonminor dependent of the juvenile court, appeals an order terminating her dependency case. (Welf. & Inst. Code, § 391.)[1] She contends that the court erred by determining that H.C.'s marriage rendered her ineligible for nonminor dependency jurisdiction. We agree with H.C. and therefore reverse.

FACTUAL AND PROCEDURAL BACKGROUND

In 2013, the juvenile court declared H.C. a dependent under section 300. The court later selected long-term foster care as H.C.'s permanent plan. After H.C. turned 18, the court continued H.C.'s dependency case as a nonminor dependent in extended foster care.

After some initial difficulties, and a two-month period of living with her half brother in Florida, the San Diego County Health and Human Services Agency (Agency) recommended in November 2016 that H.C. continue in the program. She was residing in an approved independent living placement, was actively seeking employment, and had enrolled in college. She agreed to a transitional living plan that included finding employment and obtaining her California identification card. The court adopted the Agency's recommendation and continued H.C. in extended foster care.

H.C. had periodically been involved in a romantic relationship with Alonzo S. Alonzo was reportedly abusive toward H.C. He broke her cell phone and threatened to kill himself over her. H.C. acknowledged that her relationship with Alonzo was not

---

1     Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

healthy. Nonetheless, H.C. became pregnant and believed that Alonzo was the baby's father.

Approximately six months later, the Agency discovered that H.C. had married Alonzo and was living with him. The Agency set a special hearing and requested that the juvenile court terminate H.C.'s dependency case. The Agency argued that H.C.'s marriage rendered her ineligible to participate in the extended foster care program. In support, the Agency cited an All-County Letter (No. 11-69) published by the California Department of Social Services (DSS). The All-County Letter describes the policies and procedures governing the extended foster care program. The All-County Letter states that nonminors who are married, are in the military, or are incarcerated (among others) are not eligible for extended foster care. In correspondence with the Agency's counsel, a DSS analyst explained that the reason for these exclusions is that nonminors in those situations can no longer be under the care and custody of the Agency.

H.C. opposed termination of her nonminor dependency case. At a contested hearing, her counsel argued that nothing in the applicable statutes prohibits a married nonminor from participating in extended foster care and continuing as a nonminor dependent. Her counsel criticized the Agency's reliance on the All-County Letter and contended that the All-County Letter's exclusions were unsupported by the statutes.

The court agreed with the Agency, observing, "Marriage has historically and culturally been the benchmark for full independence." The court expressed its belief that marriage ends the court's role in the dependency context in the same way that marriage emancipates a child from his or her parents. The court found that the All-County Letter

3

is the authoritative interpretation of the applicable nonminor dependency statutes until formal regulations are approved. In the court's view, because H.C. is married, she is no longer eligible for extended foster care. The court proceeded to terminate H.C.'s dependency case "due to her marriage." H.C. appeals.

## DISCUSSION

### I

A dependent minor who turns 18 years of age and has a permanent plan of long term foster care may, in the court's discretion, continue under the court's jurisdiction as a nonminor dependent. (§ 366.32; *In re Aaron S.* (2015) 235 Cal.App.4th 507, 515 (*Aaron S.*).) California enacted the current version of its nonminor dependency statutes to take advantage of increased federal funding for extended foster care. (§ 11403, subd. (a); *In re R.G.* (2015) 240 Cal.App.4th 1090, 1092-1093 (*R.G.*).) This funding is made available to states that elect to participate and have enacted programs that comply with federal requirements.

Under the current statutory scheme, a nonminor dependent is defined as either a "foster child" under federal law or a nonminor under the juvenile court's jurisdiction under section 450, who meets three requirements: (1) the individual must be under a certain age (at this point, under 21 years); (2) the individual must be in foster care under the placement and care responsibility of a county welfare department, county probation department, or Indian tribe, consortium or organization; and (3) the individual must have a transitional independent living case plan. (§ 11400, subd. (v); see 42 U.S.C. § 675(8)(B).) Contrary to its ordinary meaning, a foster child under federal law may

4

include an individual under 21 years of age who is in foster care. (42 U.S.C. § 675(8)(B)(i), (iii).)

" 'Foster care' means the 24-hour out-of-home care provided to children whose own families are unable or unwilling to care for them, and who are in need of temporary or long-term substitute parenting." (§ 11400, subd. (f).) In order to participate in extended foster care, a nonminor dependent must agree to the continued placement and care of a county welfare department or other responsible authority. (§§ 11400, subd. (u)(1), 11401, subd. (e).) The nonminor dependent must also agree to a transitional independent living case plan, which describes the nonminor dependent's appropriate placement setting, his or her permanent plan for transition to living independently, the process for assuming incremental responsibility for adult decisionmaking, and the collaborative efforts to ensure active and meaningful participation in the work and education eligibility criteria described below. (§ 11400, subds. (v)(3), (y); see *In re A.A.* (2016) 243 Cal.App.4th 765, 775 (*A.A.*).)

The statute lists a number of acceptable placements for nonminor dependents in extended foster care. (§ 11402.) One such placement is an approved supervised independent living arrangement. (§ 11402, subd. (e).) This arrangement is defined as "an independent supervised setting, as specified in a nonminor dependent's transitional independent living case plan, in which the youth is living independently . . . ." (§ 11400, subd. (w).) It does not include "detention facilities, forestry camps, training schools, or any other facility operated primarily for the detention of children who are determined to be delinquent." (42 U.S.C. § 672(c)(2); see *A.A., supra*, 243 Cal.App.4th at p. 774.)

5

In addition to the requirements discussed above, to remain eligible for extended foster care, under both federal and state law, a nonminor dependent must satisfy one of the following conditions relating to work and education: "(1) The nonminor is completing secondary education or a program leading to an equivalent credential. [¶] (2) The nonminor is enrolled in an institution which provides postsecondary or vocational education. [¶] (3) The nonminor is participating in a program or activity designed to promote, or remove barriers to employment. [¶] (4) The nonminor is employed for at least 80 hours per month. [¶] (5) The nonminor is incapable of doing any of [these activities] due to a medical condition, and that incapability is supported by regularly updated information in the case plan of the nonminor." (§ 11403, subd. (b); see 42 U.S.C. § 675(8)(B)(iv).) A county welfare department or other responsible authority must work with the nonminor dependent to maintain his or her eligibility for the program. (§ 11403, subd. (a).)

The juvenile court must maintain jurisdiction over a nonminor dependent "who meets the definition of a nonminor dependent as described in subdivision (v) of Section 11400" unless it finds that "the nonminor does not wish to remain subject to dependency jurisdiction" (§ 391, subd. (c)(1)(A)), "the nonminor is not participating in a reasonable and appropriate transitional independent living case plan" (§ 391, subd. (c)(1)(B)), or "after reasonable and documented efforts the nonminor cannot be located" (§ 391, subd. (d)(1)). If the court is considering terminating jurisdiction over a nonminor dependent, the county welfare department or other responsible authority must, among other things, submit a report to the court describing whether it is in the nonminor's best interests to

6

remain under the court's jurisdiction, provide documentation of its reasonable efforts to assist the nonminor in meeting or maintaining eligibility, make available to the nonminor information about the nonminor's dependency case, and provide certain vital documents to the nonminor (e.g., Social Security card, birth certificate, driver's license or identification card, and 90-day transition plan). (§ 391, subds. (b), (e).)[2]

"We review the decision to terminate jurisdiction over a nonminor dependent for abuse of discretion." (*Aaron S., supra*, 235 Cal.App.4th at p. 517.) Legal issues underlying the court's decision, such as the correct interpretation of the relevant statutes governing nonminor dependents, are reviewed de novo. (See *R.G., supra*, 240 Cal.App.4th at p. 1097.)

## II

H.C. contends that the court erred by terminating her nonminor dependency case based on her marriage. We agree. Neither of the applicable statutes, state or federal, mentions marriage. Rather, the statutes cover only a nonminor dependent's age, his or

---

[2]    At least one court has found that California's prior framework for nonminor dependents continues in effect for nonminor dependents who do not meet the statutory definition in section 11400, subdivision (v) and, therefore, do not qualify for federal funding: "While the primary legislative focus of the [revisions] was clearly on making continued services and benefits available to juvenile court dependents in foster care who would otherwise 'age out' of the system, we find nothing in the statutory scheme that withdraws the court's preexisting power to extend dependency jurisdiction for nonminor dependents generally. Significantly, a lack of federal funding to support the cost of providing services beyond age 18 is not a proper basis for termination of dependency jurisdiction. [Citations.] We reject the Agency's argument that under section 391 the court has *no* discretion to extend dependency jurisdiction to such nonminor dependents." (*In re Shannon M.* (2013) 221 Cal.App.4th 282, 301-302.) H.C. does not argue that her dependency case should have been continued under the prior framework, so we need not consider the issue here.

her relationship to the Agency, and his or her transitional living plan. (See § 11400, subd. (v).) A nonminor dependent's marriage does not necessarily affect any of those eligibility criteria. A married nonminor dependent's age obviously does not change. Marriage does not prevent the nonminor dependent from living in an Agency-approved placement or receiving its services (i.e., "care"). Marriage also does not prevent the nonminor dependent from participating in a transitional independent living case plan. Indeed, the responsibilities of marriage may facilitate the nonminor dependent's transition to independence. Allowing otherwise eligible married nonminor dependents to participate in extended foster care furthers the purpose of the program, which is to improve outcomes for former foster children by providing assistance, case management, and financial support as they transition to adulthood. (*A.A., supra*, 243 Cal.App.4th at pp. 772-773; see generally Shin, *A Saving Grace? The Impact of the Fostering Connections to Success and Increasing Adoptions Act on America's Older Foster Youth* (2012) 9 Hastings Race & Poverty L.J. 133.) It would impede, rather than support, the purpose of the program to exclude former foster children simply because they have married.

The Agency acknowledges that marriage is not mentioned in the applicable statutes but claims that a married nonminor cannot remain a dependent of the juvenile court. The Agency points out that a minor who marries is emancipated from his or her parents. (Fam. Code, § 7002, subd. (b); see *id.*, § 7505, subd. (b).) By analogy, at least one court has found that a married *minor* cannot be the subject of a dependency proceeding in juvenile court. (*In re J.S.* (2011) 199 Cal.App.4th 1291, 1296.) But the analogy cannot be extended to the circumstances here. A nonminor dependent is, by

8

definition, already an adult.  Marriage does not emancipate an adult from anything or anyone.

The Agency contends that including married nonminor dependents in extended foster care would create "enormous barriers" for the Agency.  It asks, rhetorically, "How would the Agency supervise a married adult residing with her husband?  How could an Agency place a married woman in foster care?"  The answer to both questions is that the Agency can supervise a married adult just as it supervises an unmarried adult.  A married adult is just as able to comply with the Agency's directives, and benefit from its services, as an unmarried adult.  Although the rights and responsibilities of marriage bind both spouses, a married woman remains just as free as an unmarried woman to act independently in the areas of concern to the Agency.  She can make her own decisions about her education, her employment, her medical care, and the other areas where the Agency assists nonminor dependents.  A married woman need not even live with her husband.  Although it may seem strange to think of a married person being in foster care, it is equally strange to think of a competent adult in foster care—and that is accepted under the statutory scheme for nonminor dependents because their participation is

voluntary.  (§§ 366.31, subd. (a)(1), 11400, subd. (u)(1), 11401, subd. (e).)  Marriage does not necessarily affect the realities of such voluntary "care" in any relevant aspect.[3]

Contrary to the Agency's concern that a married person would be impossible to supervise, and therefore, cannot participate in extended foster care, the federal government has explicitly acknowledged that married persons may participate in extended foster care.  The federal government's Child Welfare Policy Manual, which provides policy guidance to state and local authorities, poses the following question and answer:  "Question 4.  [¶]  May a youth age 18 or older who is married or enlisted in the military be eligible for title IV-E foster care?  [¶]  Answer[:]  [¶]  Yes.  There is nothing in title IV-E that prohibits a title IV-E agency from providing title IV-E foster care to an otherwise eligible youth if the youth is married or enlisted in the military (including if the youth is in the military reserves or ROTC)."  (U.S. Department of Health and Human Services, Child Welfare Policy Manual, § 8.3A, Question 4.)  Nothing about the realities

---

[3]     The Agency also asks, again rhetorically, "If the Agency made foster care payments to a married nonminor dependent, would that render the aid community property?"  We need not determine that issue here.  The Agency has made no suggestion that characterizing such aid as community property would prevent a married nonminor dependent from benefiting from the extended foster care program or otherwise impair the program's goals.

of foster care, or the extended foster care program, preclude participation by married nonminor dependents.[4]

The Agency points to apparently competing guidance, in the form of the DSS's All-County Letter No. 11-69 regarding extended foster care. The All-County Letter states that nonminors who are married, are in the military, are incarcerated, or "[a]re otherwise not eligible for [federal funding]" cannot participate in the extended foster care program. DSS published the All-County Letter under the authority of section 11403, subdivision (j), which directs DSS to "prepare for implementation of the applicable provisions of this section by publishing . . . all-county letters or similar instructions from the director . . . ." The statute directs DSS to develop formal regulations by July 1, 2013, to implement the statute's provisions (§ 11403, subd. (i)), but it has not done so.

The degree of deference that courts accord to an All-County Letter depends on the substance of the All-County Letter as a quasi-legislative rule or merely an interpretation of the statute. " ' "The appropriate degree of judicial scrutiny in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other." [Citation.] Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions

---

4    We may take judicial notice of this portion of the Child Welfare Policy Manual because its publication is an official act of an executive department of the federal government. (Evid. Code, §§ 452, subd. (c), 459, subd. (a); see *Robles v. Employment Development Dept.* (2015) 236 Cal.App.4th 530, 548 & fn. 9.) The Child Welfare Policy Manual is available at the following website: <http://www.acf.hhs.gov/cwpm>.

11

do not merit such deference, and therefore lie toward the opposite end of the continuum.' " (*Yamaha Corp. of America v. State Board of Equalization* (1998) 19 Cal.4th 1, 7 (*Yamaha*).) "Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.] Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative. To quote the statement of the Law Revision Commission in a recent report, 'The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' " (*Id.* at pp. 7-8.)

The portion of the All-County Letter at issue here is plainly interpretive, not quasi-legislative. It purports to state the eligibility criteria for extended foster care under the statute. "[I]t represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts." (*Yamaha, supra*, 19 Cal.4th at p. 11.) While we recognize the expertise of a specialized administrative agency in interpreting the statutes that it is tasked with implementing, the persuasiveness of an agency's determination depends on the circumstances. (*Id.* at pp. 12-13 [describing various factors for courts to consider].) The circumstances of the All-County Letter do not warrant a great deal of deference. The All-County Letter is an informal document that has not undergone the traditional rigors of administrative rulemaking, and according to the Legislature's directive, it should have been superseded by formal regulations years

12

ago.  The statutory scheme here is not so technical, obscure, or open-ended as to hinder judicial examination.  And the relevant text of the All-County Letter, which is devoid of citations to the statute or to other sources that might show how married people are ineligible, does not demonstrate on its face a high degree of reliability.

The All-County Letter provides no reason to depart from our interpretation, supported by federal guidance, that the applicable statutes do not preclude participation by married nonminor dependents in the extended foster care program.  Indeed, the text of the All-County Letter indicates that its eligibility requirements are based on the availability of federal funding.  It therefore makes little sense to exclude married persons, who are eligible for federal funding according to the United States Department of Health and Human Services Child Welfare Policy Manual.

The Agency relies primarily on the United States Supreme Court's interpretation of federal administrative law in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984) 467 U.S. 837 to argue that we should defer to DSS's interpretation of the statute.  However, California administrative law does not follow *Chevron*.  (See, e.g., *New Cingular Wireless PCS, LLC v. Public Utilities Com.* (2016) 246 Cal.App.4th 784, 811, fn. 23.)  " '*Chevron* deference' . . . does not exist in California."  (Asimow et al., Cal. Practice Guide:  Administrative Law (The Rutter Group 2016) ¶ 1:12.)  The Agency's reliance on *Chevron* is therefore unpersuasive.

The Agency also points out that other courts have relied on the All-County Letter.  (See *N.S. v. Superior Court* (2016) 7 Cal.App.5th 713, 720 [discussing the medical condition necessary to exclude the statute's work and education requirements and

13

verification thereof]; *R.G., supra*, 240 Cal.App.4th at pp. 1098-1099 [discussing flexibility in fulfilling the work and education requirements]; *Aaron S., supra*, 235 Cal.App.4th at pp. 518-519 [same].) Those courts did not consider the portion of the All-County Letter at issue here and did not analyze the degree of deference (if any) that it should be accorded. These authorities therefore do not establish that we should defer to the All-County Letter under the circumstances here.[5]

### III

The Agency contends, in the alternative, that termination of H.C.'s dependency case was proper because H.C. left her approved placement and moved in with Alonzo. The Agency claims that H.C. did not seek approval of her new residence and speculates that the residence would not have been approved, based on Alonzo's alleged history of abuse.

A married nonminor dependent, just like an unmarried one, must comply with the requirements of the extended foster care program. Even assuming that leaving an

---

[5] In a related argument, the Agency contends that California's plan for extended foster care, which it submitted to the federal government and which references the All-County Letter, restricts extended foster care eligibility to unmarried individuals. The Agency has not complied with the Rules of Court regarding judicial notice, which require a separate motion, so we may disregard the Agency's reliance on the plan. (See Cal. Rules of Court, rule 8.252(a)(1).) However, even if we were to consider the plan, it would not affect our analysis of the statutes governing H.C.'s dependency case. Whatever the content of California's plan (and it is not entirely clear), California's statutes do not foreclose the participation of married nonminor dependents in extended foster care. To hold that the plan overrides those statutes would allow the proverbial tail to wag the dog. We note that H.C.'s ability to obtain extended foster care *funds* from DSS is a question that we do not consider here. We consider only the statutory definition of a nonminor dependent and whether the juvenile court was correct to find that it excludes married nonminors.

14

approved placement could constitute grounds for termination, the record does not reflect that the Agency asserted this ground for termination in the juvenile court or that the juvenile court adopted it. In its report prior to the termination hearing, the Agency wrote, "Although [H.C.] was doing well in meeting the [extended foster care] criteria by attending school and looking for employment, she does not meet [the] criteria at the moment because she reports that she got married . . . ." Similarly, the court stated at the hearing that H.C. was not "eligible" for extended foster care "by virtue of the marriage." We cannot make the determination for the first time on appeal that the juvenile court should have terminated H.C.'s dependency case not because of her marriage, but because of her alleged failure to comply with the requirements of the extended foster care program. Such arguments should be presented to the juvenile court in the first instance.

In this regard, we observe that the entire trajectory of H.C.'s dependency case would have been different if the Agency had been aware that H.C.'s marriage does not render her ineligible for extended foster care. The Agency must work to ensure H.C.'s eligibility for extended foster care. (See § 11403, subd. (a).) It is reasonable to believe that the Agency would have acted differently if it had known that H.C. could participate in extended foster care as a married nonminor dependent. If the Agency had known that H.C. could both marry and participate in extended foster care, it could have advised H.C. as such, rather than telling her that marriage would render her ineligible. The Agency could also have endeavored to find a placement setting that would have been acceptable to both the Agency and H.C. and that would have prevented H.C.'s termination from the program. Under these circumstances, H.C. should be given the opportunity to

15

demonstrate her compliance with the requirements of the program under the proper legal standards.

DISPOSITION

The order is reversed.

AARON, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.