Filed 8/30/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re M.W., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E068981 |
| Plaintiff and Respondent, | (Super.Ct.No. J251742) |
| v. | O P I N I O N |
| J.B. et al., | |
| Defendants and Respondents; | |
| M.W., | |
| Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Reversed with directions.

Konrad S. Lee, under appointment by the Court of Appeal, for Appellant.

No appearance for Defendants and Respondents.

1

Michelle D. Blakemore, County Counsel, and Pamela J. Walls, Special Counsel, for Plaintiff and Respondent.

## I.  INTRODUCTION

Appellant, 19-year-old M.W., was a nonminor dependent of the court until it terminated dependency jurisdiction over him in August 2017.  One of the acceptable living arrangements for nonminor dependents is a "'[s]upervised independent living placement'" (SILP).  (Welf. & Inst. Code, § 11400, subd. (w).)[1]  The court terminated dependency jurisdiction over M.W. because he had moved in with a former foster mother, and the court believed a former caregiver's home could not qualify as a SILP.  We conclude the court erred.  Nothing in the law disqualifies a former caregiver's home as a SILP.  Even the document on which plaintiff and respondent, San Bernardino County Children and Family Services (CFS), relied for its argument—a form developed by the California Department of Social Services—does not disqualify a former caregiver's home.  We also conclude the error was prejudicial to M.W.  We therefore reverse and remand for the court to consider whether to retain or terminate dependency jurisdiction, with the proper understanding of the law relating to SILPs.

## II.  FACTS AND PROCEDURE

A.  *Dependency History as a Minor*

In 2006, a Nevada court removed M.W. and his twin sister, C.W., from the custody of defendant and respondent, L.W. (mother).  Mother had a mental illness that

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

prevented her from adequately caring for and supervising them. The Nevada dependency case closed in 2009 with defendant and respondent, J.B. (father), obtaining custody of M.W. and his sister. At some point, the children went to live in Washington with a relative who became their legal guardian. After that relative could no longer care for the children, C.V. (half sister) filed a petition to become their legal guardian in California.

In October 2013, CFS placed M.W. and his sister into protective custody because half sister no longer wished to proceed with the guardianship. M.W. was then 14 years old. Half sister and her husband could not handle the children's behavioral problems.

Father had been abusive to M.W. and he did not wish to live with father. M.W. had not seen mother in eight years. M.W. kept in touch with a former foster mother in Nevada, M.J.L., but she was elderly and he was unsure if she could care for him. CFS placed M.W. in a group home.

CFS filed a petition and the juvenile court found true that: (1) M.W. had suffered physical harm inflicted by father nonaccidentally (§ 300, subd. (a)); (2) the parents had failed to provide adequate care, supervision, and provisions for M.W. (§ 300, subd. (b)); and (3) mother's whereabouts and ability to parent M.W. were unknown (§ 300, subd. (g)). The court removed M.W. from the parents' custody and granted reunification services to father but not mother.

Father received reunification services through the 18-month review hearing, at which time the court terminated his services and ordered a planned permanent living arrangement for M.W. From the beginning of these proceedings, the court authorized

3

M.W. to visit M.J.L. in Nevada during his Thanksgiving and holiday breaks from school. The court also authorized him to visit M.J.L. for two weeks during his summer break in 2014. CFS assessed and approved M.J.L.'s home for visits in 2013.

CFS never assessed M.J.L.'s home for permanent placement. It received court authorization to assess another home in Nevada under the Interstate Compact on the Placement of Children (ICPC).[2] This was the home of K.J., M.J.L.'s best friend. K.J. had a relationship with M.W. and was initially willing to care for him. But before CFS submitted the ICPC paperwork, K.J. reconsidered her decision to take placement of M.W.

For the most part, M.W. lived in a group home while he was a minor in the dependency system. At times, his behavior was good, and at other times, he had behavioral issues. For instance, during the 12-month review period, he had a physical altercation with another resident and was not following staff directives. During the postpermanent plan period, he lived in a foster home for a short time, but this ended when he left the home at night without permission and refused to accept his foster mother's authority. He went to two different group homes after the foster home, and at both group homes, he left without permission, and warrants were issued for his return. By April 2016, a delinquency petition had been filed against him and he was under probation

---

[2] "The ICPC is an agreement among California and other states that governs 'sending, bringing or causing any child to be sent or brought into a receiving state for placement in foster care or as a preliminary to a possible adoption . . . .' [Citation.] 'The purpose of the ICPC is to facilitate cooperation between participating states in the placement and monitoring of dependent children.'" (*In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 458.) The Legislature has codified the provisions of the ICPC at Family Code section 7901.

4

supervision.  His school had also suspended him for fighting and he had transferred to another school.

As M.W.'s 18th birthday approached, he was doing well at his new school and his behavior at the group home had improved.  The court scheduled a nonminor dependent hearing for March 2017, when M.W. would turn 18.

B.  *Nonminor Dependent Proceedings*

In preparation for the nonminor dependent hearing, CFS reported that M.W. continued to do well in his group home and had no behavioral issues.  He was no longer on probation and had no further delinquency issues.  He wanted to remain in extended foster care.  His goal was to move from the group home into M.J.L.'s Nevada home at the end of the school year.  The social worker opined that M.J.L. had "been very supportive of the child's well-being and goals and ha[d] been a consistent connection in his life."

On M.W.'s 18th birthday, he and the social worker signed a "mutual agreement for extended foster care."  Among other things, he agreed that if he left his "foster care placement, the foster care funding may be stopped."  CFS, for its part, agreed to:  (1) "[h]elp [him] choose an appropriate approved or licensed placement"; and (2) "help resolve any problems that arise with [his] placement."  M.W.'s "90-day Transition Plan" identified a "lower level of care with" M.J.L. as his housing goal, and under "Action Plan," the form stated:  "Submit ICPC or transfer to Nevada."

At M.W.'s nonminor dependent hearing in March 2017, the court found he was eligible to remain under its jurisdiction as a nonminor dependent. It authorized CFS to initiate an ICPC assessment of M.J.L.'s home.

After CFS tried to initiate the ICPC process with Nevada, it learned that Nevada did not participate in the ICPC for nonminor dependents. CFS informed M.W. that he would have to opt out of extended foster care if he chose to live in Nevada. M.W. stayed in his group home for a few months, but in June 2017, he moved to M.J.L.'s home in Nevada. CFS asked him to sign "transitioning out" paperwork before he left, but he did not do so. He contacted CFS after his move and reported that he was doing well; he was looking for a job, attending his last year of high school, and had obtained medical coverage. CFS informed M.W. that he could return to extended foster care prior to age 21, should he return to California.

CFS requested that the court dismiss and discharge M.W. as a nonminor dependent, "as he ha[d] voluntarily left placement and ha[d] moved out of state," CFS had not approved the new placement, and Nevada would not approve it. M.W. filed an objection to CFS's request, arguing that he did not have to opt out of extended foster care if he stayed in Nevada. With his objection, he submitted All County Letter No. 14-33, issued by the Department of Social Services on July 3, 2014 (ACL 14-33). The stated purpose of ACL 14-33 was to set forth policies and procedures for placing nonminor dependents in extended foster care out of state. (ACL 14-33 at p. 1.) M.W. relied on a portion of ACL 14-33 stating that, when the receiving state (here, Nevada) is unwilling to

6

accept an ICPC placement, "the county placing agency will be responsible for ensuring that monthly supervision and/or services are provided to these" nonminor dependents. (ACL 14-33 at p. 3.)

The court held a hearing on the request to discharge M.W. as a nonminor dependent. The court recognized that the language in ACL 14-33 on which M.W. relied gave "authority for something. It's vague . . . as to what the authority is exactly for or how it would be carried out. Clearly, there is an intent to do something for these kids." CFS argued that it could not send a social worker to assess, approve, and supervise M.W.'s placement in Nevada because that would violate the law—that is, CFS's social workers were not licensed to practice in Nevada. CFS represented that Nevada does not provide extended foster care for nonminor dependents under the ICPC, and so the Nevada social workers would not inspect and approve a home for such dependents.

M.W.'s counsel clarified that M.J.L. was "not a current foster parent in Nevada," but M.W. was not asking for CFS to approve M.J.L. as a foster parent, which counsel recognized "would be an issue." Rather, M.W. wanted her home assessed as a SILP, a type of living arrangement under which nonminor dependents may receive extended foster care. Counsel indicated that M.W. was renting a room from M.J.L. CFS countered that M.J.L.'s home was ineligible for SILP treatment because renting from a former caregiver did not qualify as a SILP. CFS relied on "the SILP paperwork" for its argument that a former caregiver's home did not qualify as a SILP, and it indicated that it could "send the Court the form."

7

The court noted that ACL 14-33 addressed SILPs when the receiving state was unwilling to process the placement through the ICPC. Specifically, the letter stated "the county may contract with a private agency within the receiving state for placement, approval, and supervision." (ACL 14-33 at p. 6.) But the court agreed with CFS that M.J.L.'s home would not qualify as a SILP because she was a former caregiver. The court apparently accepted the form on which CFS relied and stated: "I have also the SILP criteria that I will have basically considered for—date-stamped for today. That will be considered as part of the record incorporated by reference for things I have considered . . . ." Although neither the parties nor the court identified this date-stamped document by name, it seems they were referring to Department of Social Services form SOC 157A (Supervised Independent Living Placement (SILP) Approval and Placement Agreement).[3]

The court ultimately held: "I agree this would not be a SILP placement because it is with a former caregiver, so I will deny the request today, and if things change . . . I would definitely reconsider if he is able to find what would otherwise be a SILP placement . . . . [¶] . . . [¶] . . . if he were in a true SILP placement or SILP-type situation, my interpretation should be the county should be assessing through a private

_____

[3] On our own motion, we take judicial notice of form SOC 157A, available on the Department of Social Services Web site. The particular version of the form in effect at the time of these events bears a date of April 2012 <http://www.cdss.ca.gov/cdssweb/entres/forms/English/SOC157A.pdf>[as of Aug. 30, 2018]. (Evid. Code, § 452, subd. (c) [courts may take judicial notice of the "[o]fficial acts of the . . . , executive . . . department[]" of the U.S. or any state]; *In re H.C.* (2017) 17 Cal.App.5th 1261, 1268, fn. 4 [taking judicial notice of the U.S. Department of Health and Human Services Child Welfare Policy Manual].)

8

agency.  That's the way I read it."  The court further explained:  "[T]here's one section that said the county may wish to contract with a private agency in order to effectuate the assessment if it is a SILP, so I think that gives authority for the county to do that.  It's not ripe yet.  We don't have that yet."  It discharged M.W. as a nonminor dependent.

## III.  DISCUSSION

A. *Overview of Extended Foster Care for Nonminor Dependents*

Since 1976, courts have had the discretion to "'retain jurisdiction over any person who is found to be . . . a dependent child of the juvenile court until the . . . dependent child attains 21 years of age.'"  (§ 303, subd. (a); accord, *In re Shannon M.* (2013) 221 Cal.App.4th 282, 292.)  But "until recently, the utility of doing so was limited by insufficient funds to assist nonminor dependents."  (*In re Shannon M.*, *supra*, at p. 285.)  On January 1, 2012, a new statutory scheme—the California Fostering Connections to Success Act (the Act)—became operative.  (*Ibid.*)  The Act takes advantage of increased federal funding for extended foster care for certain nonminor dependents.  (*Ibid.*)

The Act defines a nonminor dependent as a foster child under federal law (42 U.S.C. § 675(8)(B)) or "a nonminor under the transition jurisdiction of the juvenile court," who also meets three requirements:  "(1) the individual must be under a certain age (at this point, under 21 years); (2) the individual must be in foster care under the placement and care responsibility of a county welfare department, county probation department, or Indian tribe, consortium or organization; and (3) the individual must have

9

a transitional independent living case plan. (§ 11400, subd. (v); see 42 U.S.C. § 675(8)(B).)" (*In re H.C.*, *supra*, 17 Cal.App.5th at p. 1264.)

The nonminor dependent's transitional independent living case plan "describes the nonminor dependent's appropriate placement setting, his or her permanent plan for transition to living independently, the process for assuming incremental responsibility for adult decisionmaking, and the collaborative efforts to ensure active and meaningful participation in the work and education eligibility criteria . . . . (§ 11400, subds. (v)(3), (y); [citation].)"[4] (*In re H.C.*, *supra*, 17 Cal.App.5th at p. 1265.)

The Legislature intended that the nonminor dependent and the county welfare department "shall work together to ensure the nonminor dependent's ongoing eligibility" for extended foster care. (§ 11403, subd. (a).) "The court shall continue dependency jurisdiction over a nonminor who meets the definition of a nonminor dependent" unless it finds that "the nonminor does not wish to remain subject to dependency jurisdiction" (§ 391, subd. (c)(1)(A)), "the nonminor is not participating in a reasonable and appropriate transitional independent living case plan" (§ 391, subd. (c)(1)(B)), or "the nonminor cannot be located" after reasonable and documented efforts (§ 391, subd. (d)(1); accord, Cal. Rules of Court, rule 5.555(d)(2)). Even when the court terminates dependency jurisdiction, it shall retain general jurisdiction over the nonminor so that he

---

[4] The work and education eligibility criteria mandate that the nonminor dependent be: Completing a secondary education or a program with an equivalent credential; enrolled in a postsecondary or vocational institution; participating in a program or activity to promote or remove barriers to employment; working for at least 80 hours per month; or incapable of doing any of these things due to a medical condition. (§ 11403, subd. (b).)

or she may petition the court to resume dependency jurisdiction before the nonminor turns 21. (§§ 303, subd. (b), 388, subd. (e), 391, subd. (d)(2).)

The juvenile court has discretion to continue or terminate jurisdiction over a nonminor. (§§ 303, subds. (a)-(b), 366.32; *In re H.C.*, *supra*, 17 Cal.App.5th at p. 1264.) Thus, "'[w]e review the decision to terminate jurisdiction over a nonminor dependent for abuse of discretion.' [Citation.] Legal issues underlying the court's decision, such as the correct interpretation of the relevant statutes governing nonminor dependents, are reviewed de novo." (*In re H.C.*, *supra*, at p. 1266.)

B. *Placements for Nonminor Dependents: The SILP Option*

One of the acceptable placements for nonminor dependents under the Act is a SILP. (§§ 366.32, subd. (b), 11402, subd. (e).) A SILP is "an independent supervised setting, as specified in a nonminor dependent's transitional independent living case plan, in which the youth is living independently . . . ." (§ 11400, subd. (w).) The Act states the Department of Social Services, "in its consultation with stakeholders, shall define the supervised independent living setting which shall include, but not be limited to, apartment living, room and board arrangements, college or university dormitories, and shared roommate settings . . . ." (§ 11403, subd. (i).) The Act directs the Department of Social Services to develop implementing regulations on or before July 1, 2013, but the department has not done so. (*Ibid.*; *In re H.C.*, *supra*, 17 Cal.App.5th at p. 1268.)

The Act also directs the Department of Social Services to prepare for implementation by publishing, in consultation with stakeholders, "all-county letters or

11

similar instructions from the director." (§ 11403, subd. (j).) ACL 14-33, on which M.W. relied below, is just one of the many All County Letters relating to the Act. Another one, All County Letter No. 11-77 (ACL 11-77), addresses SILPs in more detail. It explains that a "SILP is an entirely new and flexible placement type for foster care that was created for [nonminor dependents] participating" in extended foster care. (*Id.* at p. 6.)[5] "It is intended to provide young adults with the opportunity for highly independent living experiences while receiving financial support along with the safety net of a case manager . . . ." (*Ibid.*) Nonminor dependents "are responsible for finding their own SILP units; this is not a typical placement where the county places the individual in a home or facility that has already been designated as a licensed or approved placement facility. The [nonminor dependents] may find an apartment close to school or work, or they may rent a room from a friend." (*Ibid*.) According to ACL 11-77, SILPs can include apartments, single room occupancies, dorms or university housing, and "[r]enting a room (including from a former caregiver)." (*Id*. at p. 7.)

Form SOC 157A, on which CFS relied below, is a two-page form that the social worker and nonminor dependent sign when approving and agreeing to a SILP. Part I of the form is called "**SILP Placement Type**," and it directs the parties to check a box for "the option that best describes the young adult's placement." (Form SOC 157A at p. 1,

---

[5] ACL 14-33 is part of the record on appeal, but ACL 11-77 is not. We take judicial notice of ACL 11-77, dated November 18, 2011, and available on the Department of Social Services Web site <http://www.cdss.ca.gov/lettersnotices/entres/getinfo/ acl/2011/11-77.pdf >[as of Aug. 30, 2018]. (Evid. Code, § 452, subd. (c); *N.S. v. Superior Court* (2016) 7 Cal.App.5th 713, 720, fn. 5 [taking judicial notice of an All County Letter].)

12

capitalization omitted.)  One of the many options is "[r]oom rental (*not with former caregiver*)."  (*Ibid.*)  Another option is "[r]oom rental from former caregiver."  (*Ibid.*)

Out-of-state placements under the Act "are subject to the applicable requirements of the" ICPC.  (Welf. & Inst. Code, § 11403, subd. (f)(1).)  ACL 14-33 provides that, when "the receiving state does not permit and/or require a SILP placement through the ICPC, the county will be responsible for ensuring the proposed SILP is inspected and approved . . . . Additionally, the county will be responsible for providing monthly face-to-face supervision and ensuring the provision of services pursuant to the case plan.  These responsibilities may be done through contracting services with an agency in the receiving state" (ACL 14-33 at p. 8), including with a private agency (*id.* at p. 6).  Along the same lines, the ICPC states the county welfare department "may enter into an agreement with an authorized public or private agency in the receiving state providing for the performance of one or more services in respect of that case . . . ."  (Fam. Code, § 7901.)

Aid under the Act "may be suspended when the nonminor dependent no longer resides in an eligible facility," or after the court terminates dependency jurisdiction.  (§ 11403, subd. (e).)  At the same time, the Legislature recognized "that transitions to independence involve self-initiated changes in placements," and it intended that regulations regarding the approval of SILPs "ensure continuity of placement and payment while the nonminor dependent is awaiting approval of his or her new" SILP.  (§ 11402.2.)

C. *The Court Prejudicially Erred When It Terminated Dependency Jurisdiction Based on the Belief That M.J.L.'s Home Could Not Qualify as a SILP*

M.W. contends the court abused its discretion because he wanted to remain in extended foster care, and living out of state with a former caregiver did not automatically disqualify his living arrangement as a SILP. We agree the court erred because it based its order on a misunderstanding of the law. In addition, this error was not harmless. It is reasonably probable the court would have retained jurisdiction over M.W. had it not misunderstood the law.

Section 391 mandates that a court continue dependency jurisdiction over a nonminor dependent *unless* the court finds one of three things—the person does not wish to remain a dependent, the person is not participating in a reasonable and appropriate transitional independent living case plan, or the person cannot be located. (§ 391, subds. (c)(1), (d)(1).) The court did not expressly make any of these findings, but its concern was M.W.'s move out of the group home to M.J.L.'s home, which CFS had not assessed or approved as a SILP. We may infer the court found M.W. was not participating in his transitional independent living case plan because M.J.L.'s home could not be an acceptable placement. The transitional independent living case plan should describe, among other things, "the nonminor's appropriate supervised placement setting." (§ 11400, subd. (y).)

To begin with, M.W.'s case plan identified M.J.L.'s home as an appropriate placement that he would transition into from the group home. The 90-day Transition

Plan that he and CFS completed right before his nonminor dependent hearing stated his transitional goal was a lower level of care with M.J.L., and the action plan was to submit the ICPC paperwork "or transfer to Nevada." Consistent with this plan, when the court decided to continue jurisdiction over M.W. as a nonminor dependent, it authorized CFS to initiate the ICPC process with Nevada.

But when the court terminated jurisdiction, it based its ruling on the notion that M.J.L.'s home could not be an appropriate SILP because she was a former caregiver. Nothing in the law disqualifies a former caregiver's home as a SILP. "[R]oom and board arrangements" are perfectly acceptable as SILPs, according to the Act. (§ 11403, subd. (i).) And, contrary to CFS's argument below, form SOC 157A contemplates that a former caregiver's home may be a SILP. The form simply lists "[r]oom rental (*not with former caregiver*)" as a category separate from room rental with a former caregiver. (Form SOC 157A at p. 1.) ACL 11-77 also specifically lists room rental with a former caregiver as an acceptable SILP. Accordingly, the court misinterpreted the law.

While we review the termination decision for abuse of discretion, a court abuses its discretion when it misinterprets or misapplies the law. (*In re Shannon M.*, *supra*, 221 Cal.App.4th at p. 289; *Prigmore v. City of Redding* (2012) 211 Cal.App.4th 1322, 1334; *People v. C.S.A.* (2010) 181 Cal.App.4th 773, 778.) "If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria

15

or incorrect legal assumptions is not an exercise of informed discretion . . . ." (*Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 106.)

Moreover, we cannot say this error was harmless. It is reasonably probable that M.W. would have obtained a more favorable result, had the court realized M.J.L.'s status as a former caregiver did not disqualify her home. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *In re Aaron S.* (2015) 235 Cal.App.4th 507, 521 [applying the harmless error standard of *Watson* to a purported error in terminating dependency jurisdiction].) This is clear from the court's comments on the record. It expressly agreed with CFS's position that a former caregiver did not qualify as a SILP, but said: "*I would definitely reconsider if he is able to find what would otherwise be a SILP placement . . . .* [¶] . . . [¶] . . . if he were in a true SILP placement or SILP-type situation, my interpretation should be the county should be assessing through a private agency. That's the way I read it." (Italics added.) The court simply did not believe the issue was "ripe yet," based on its misunderstanding of the law. In the absence of this error, it seems likely the court would have retained dependency jurisdiction over M.W. and ordered CFS to assess M.J.L.'s home. Such a ruling would be consistent with the Legislature's direction that the county and the nonminor "work together to ensure the nonminor dependent's ongoing eligibility" for extended foster care (§ 11403, subd. (a)), as well as ACL 14-33's direction that the county remains responsible for assessing a proposed SILP out of state, when the receiving state refuses to do so under the ICPC (ACL 14-33 at p. 8).

16

CFS argues the court did not abuse its discretion in terminating dependency jurisdiction because, once M.W. left the group home for an unapproved placement, he no longer met the definition of a nonminor dependent, which required that he be "in foster care under the placement and care responsibility" of CFS.  (§ 11400, subd. (v)(2).) Furthermore, CFS argues that by not living in an approved foster care placement, M.W. was not participating in his transitional independent living case plan.  CFS also points to section 11402, which lists the placement requirements for persons to be eligible for foster care aid, and while an "approved [SILP] for nonminor dependents" is one of the eligible placements, an unapproved home is not.  (§ 11402, subd. (e).)

These arguments fail to persuade us.  They conflate the criteria for extended foster care aid with the power to retain dependency jurisdiction more generally.  We would agree that to the extent M.W. does not meet the statutory definition of a nonminor dependent under the Act, or is not in an approved placement under the Act, his aid may be suspended (§§ 11402, 11403, subd. (e)), and he loses the protection of section 391, which mandates that the court continue dependency jurisdiction over a nonminor dependent unless it can make one of the required findings (§ 391, subds. (c)(1), (d)(1)). But the court was not *required* to terminate dependency jurisdiction simply because M.W. was not, for the moment, in an approved foster care placement.  As we have discussed, since 1976, juvenile courts have had the discretion to retain dependency jurisdiction over nonminors who are under 21.  (§ 303, subd. (a); *In re Shannon M.*, *supra*, 221 Cal.App.4th at p. 292.)  The Legislature did not wipe out this law when it

17

enacted the Act and provided for extended foster care aid to a special category of nonminors called nonminor dependents. "Nothing in the Welfare and Institutions Code or the California Rules of Court restricts the ability of the juvenile court to maintain dependency jurisdiction or delinquency jurisdiction over a person, 18 years of age or older, who does not meet the eligibility requirements for status as a nonminor dependent and to proceed as to that person under the relevant sections of the Welfare and Institutions Code and California Rules of Court." (Cal. Rules of Court, rules 5.555(a)(2), 5.900(a)(2).)

In other words, juvenile courts have discretion to retain dependency jurisdiction over nonminors even when they do not meet the statutory requirements for nonminor dependent status. (*In re Shannon M.* (2013) 221 Cal.App.4th at p. 301 [explaining that, while the Act made "continued services and benefits available to juvenile court dependents in foster care who would otherwise 'age out' of the system," nothing in the Act withdrew the court's preexisting power to extend dependency jurisdiction for nonminors generally].) And, we see nothing in the law that prohibits the courts from retaining dependency jurisdiction over nonminors while a county assesses a placement, so that the nonminors may once again meet the requirements for nonminor dependent status and regain eligibility for aid.

It is, of course, true that juvenile courts also have discretion to terminate jurisdiction over a nonminor dependent, when they can make one of the findings required by section 391. But here, the court's misunderstanding of the law regarding SILPs

18

effectively prevented it from exercising its discretion in a proper manner. The record is clear that if the court had realized M.J.L.'s home could be a SILP, it was reasonably probable the court would have exercised its discretion to retain dependency jurisdiction over M.W., even if his aid under the Act may have been suspended.

CFS also argues that the court did not err because "[a]ny authorization contained" in ACL 14-33 to contract with a private agency in Nevada was "not mandatory," and "the Court still retains the discretion not to make such an order." The court's discretion is precisely our point—the court seemed reasonably likely to exercise its discretion and make that order, except that it mistakenly believed M.J.L.'s home could not be a SILP. CFS further asserts that All County Letters are not binding on the courts and are not entitled to deference. First, we note that several courts have relied on and applied All County Letters relating to the Act. (*N.S. v. Superior Court*, *supra*, 7 Cal.App.5th at pp. 720-724 [relying on an All County Letter to explain the "medical condition" exemption from the Act's work and education requirements]; *In re R.G.* (2015) 240 Cal.App.4th 1090, 1098-1100 [relying on an All County Letter to explain the nonminor dependent's work and education requirements]; *In re Aaron S.*, *supra*, 235 Cal.App.4th at pp. 518-519 [same].) Second, even if agency interpretations of statutes are not binding or even authoritative on courts, they are one of the tools available, and they may be helpful, enlightening, or even convincing depending on the circumstances. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8.) The case CFS cites that declined to defer to an All County Letter, *In re H.C.*, did so after analyzing the context of

19

the letter's statements and concluding the statements did not deserve deference over the court's own interpretation of the statute. (*In re H.C.*, *supra*, 17 Cal.App.5th at pp. 1268-1269.) CFS has not explained why the court should disregard ACL 14-33 as unhelpful, unenlightening, or unconvincing, even if it is not binding.

In sum, the court did not properly exercise its discretion because it did so based on a misunderstanding of the law. We will reverse the court's termination order, and on remand, the court should reconsider the jurisdictional issue, understanding that M.J.L.'s home is not disqualified as a SILP simply because she is a former caregiver.

## IV. DISPOSITION

The order is reversed. On remand, the court should consider whether to retain or terminate dependency jurisdiction over M.W., given that M.J.L.'s status as a former caregiver does not disqualify her home as a SILP.

CERTIFIED FOR PUBLICATION

FIELDS
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

20